**AFFIRMED; Opinion Filed April 2, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00866-CV

### MICHAEL WIERSCHEM, M.D., Appellant
### V.
### WILLIAM BOURGEOIS AND CAROLYN BOURGEOIS, Appellees

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-02281-2018**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Nowell

William Bourgeois and Carolyn Bourgeois[1] sued Michael Wierschem, M.D.[2]

for negligence. Appellees timely filed an expert report pursuant to Chapter 74 of the

Texas Civil Practice and Remedies Code. Wierschem filed a motion to dismiss the

suit pursuant to section 74.351, which the trial court denied. In four issues,

Wierschem argues the trial court erred by denying his motion to dismiss because

---

[1] Because William and Carolyn Bourgeois have the same surname, we will refer to them individually by their first names and collectively as "appellees."

[2] Appellees also sued Frisco Medical Center LLP d/b/a Baylor Scott & White Medical Center-Frisco ("Baylor Frisco"). Baylor Frisco is not a party to this appeal.

appellees did not serve an expert report that meets the requirements of section 74.351. Specifically, Wierschem asserts appellees' expert fails to establish he is qualified to opine on causation, does not clearly describe the standard of care Wierschem allegedly violated, and does not provide the requisite causal connection. We affirm the trial court's order and remand this cause to the trial court for further proceedings.

FACTUAL BACKGROUND

## A. Allegations in the Original Petition

According to appellees' live pleading, William sought treatment from Wierschem, a urologist and surgeon. On March 8, 2016, Wierschem performed two procedures on William: a laser thulium ablation of the prostate and a circumcision. On the morning of surgery, William was in good mental health.

Following the day surgery, William was discharged from Baylor Frisco. In the evening while at home, William began acting strangely and showing signs of mental deterioration; Carolyn called the paramedics. William was taken to Medical Center of McKinney Hospital where tests showed his sodium level was 119. Appellees allege: "This reading is significantly lower than what would be a normal reading. This kind of a reading is a classic sign indicative of brain injury with mental impairment." Since then, William has suffered mental impairment and is unable to perform normal day-to-day activities.

Appellees allege Wierschem negligently administered too many liters of lactated ringers during the procedures, which depleted William's sodium reserves. They also allege Wierschem was negligent because he failed to perform a blood test after the procedure to determine William's sodium level, which he should have done because of the large quantity of lactated ringers administered; failed to keep William for observation following the procedure, which he should have done because of William's age and the quantity of lactated ringers administered; and failed to administer or order the administration of saline solutions to William.

As required by section 74.351 of the Texas Civil Practice and Remedies Code, appellees timely served an expert report from Robert Kessler, M.D. Wierschem objected to the report and moved to dismiss. The trial court gave appellees thirty days to file an amended report "that provides a fair summary of Dr. Kessler's opinion describing the causal relationship between Dr. Wierschem's failure to meet the applicable standard of care and the injury, harm or damages claimed" by appellees. Appellees did so. Wierschem again objected to the report and filed a second motion to dismiss arguing the revised report also did not satisfy the requirements of section 74.351. The trial court denied the motion, and this appeal followed.

## B.    Amended Expert Report from Robert Kessler

Kessler is a medical doctor who practiced urology for approximately forty-five years until he retired on July 1, 2018; from 1988 until his retirement, he was a

Professor of Urology at Stanford University Medical Center.[3]  He performed numerous procedures involving the prostate, including procedures similar to those Wierschem performed on William.  Kessler also chaired the Quality Assurance Programs at Stanford University Medical Center; in that role, he reviewed claims to determine whether medical practitioners, hospitals, clinics, and nursing personnel breached the standard of care.  As Chair, he also studied many areas of urology practice, including prostate ablation.  From his service as Chair and from many years of practice, he is familiar with the standards of care applicable to a practicing urologist.  Kessler is familiar with the condition known at hyponatremia, which is defined as a sodium reading less than 134.

Kessler's amended report states William's sodium level was 139 when it was tested approximately one month before the surgery.  The pre-surgery records indicate no issues with William's mental functioning; "he was alert, oriented to place and time, and functioned quite well."

Wierschem performed a laser thulium ablation of the prostate, a procedure that involves a "high-energy device vaporizing the prostate and opening up the channel for urine flow."  The procedure evaporates the tissue on the prostate, opens vessels, allows the vessels to absorb fluids, and depletes sodium.  Normally water irrigation is done during and after a thulium ablation of the prostate.

---

[3] Kessler's curriculum vitae is attached to and incorporated into his amended report.

Kessler's amended report states William was given at least six liters of lactated ringers, he took water orally, and he was administered irrigation fluids. "The combination of these fluids should have alerted the nurses and the doctor that there was a probability of sodium depletion." Even though the lactated ringers contain sodium, "the amount of lactated ringers used plus the bladder irrigation plus the oral consumption of fluids were too much and were the only cause of the sodium depletion. . . . Again, surgeons and nursing staff should know of and be aware of the possibility of abnormal electrolytes which could include hyponatremia."

The large amount of fluid administered to William, which was not recorded, should have alerted Wierschem and the nurses that blood tests for hematocrit, CBC, and electrolytes should have been performed. Given Mr. Bourgeois' age and the combination of procedures done, the standard of care would dictate that a simple blood test be done after the procedure. Sodium depletion would show up almost immediately in the blood work. However, no blood test was performed after the procedure. Not performing the test was a deviation from the standard of care, was negligent, and caused damage to William. Kessler states: "The failure to address fluid issues during Mr. Bourgeois' stay at Baylor Frisco under the direction of Dr. Wierschem meets the definition of negligence, ordinary care [sic], and proximate causation."

Kessler's amended report states there should have been a record of the full amount of fluids William excreted; the standard of care dictates "that the amount of

fluids expelled by Mr. Bourgeois [sic] so that the nurses and doctors would be informed of the amount of fluids excreted and this would tell them that this should be performed."  Such information "could have given the nurse or doctor an indication of the amount of fluids that had gone through his body.  Whether those fluids would have been urine or irrigation fluids, the amount is important to know."  No record of the amount of fluid excreted by William exists.

The standard of care for this procedure also "would include close monitoring of the patient."  However, the medical records include few notes about monitoring William after he left the recovery area.  Given William's age and the procedures done, "[m]ost physicians would keep the patient overnight . . . . This would have allowed for earlier monitoring and a quicker response had the test been done to determine whether he suffered from hyponatremia."

Kessler's amended report states: "The day of admission to Medical Center of McKinney, Mr. Bourgeois' sodium was 119.  This is a critical finding which could be a cause of cell damage in the brain."  Based on his knowledge about what occurs when one does not have an adequate sodium level and his review of the notes from a neurologist, Kessler determined William had cell damage to his brain but did not have a stroke.  His amended report states: "Readings as low as 119 are very serious and can lead to, and in this case, did lead to brain damage for Mr. Bourgeois."  He continues: "In the practice of urology, a practitioner must be aware of this condition happening when fluids are used."

Chapter 74 of the Texas Civil Practice and Remedies Code requires claimants in health care liability cases to serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The purpose of this requirement "is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018).

"Importantly, the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 74.351(*l*)). The Texas Supreme Court has "held that an expert report demonstrates a 'good faith effort' when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *Id.* (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Id.* The "court's job at this stage of the litigation is not to

weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory." *Id.* at 226.

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Id.* A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

## A.    Qualifications

Wierschem argues Kessler is not qualified to offer an expert opinion on causation because Kessler is not a neurologist or blood chemist and, thus, lacks the qualifications to draw a connection between low sodium levels and brain damage. In a suit involving a health care liability claim against a physician, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed "only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE § 74.403(a).  Texas Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact issue.  TEX. R. EVID. 702.

Kessler's amended report addresses his "knowledge, skill, experience, training, and education" regarding the subject of this lawsuit: how a urologist's alleged failure to monitor fluids administered to and excreted by a patient as well as the failure to order a blood test to measure sodium levels caused the patient's sodium levels to become depleted without being detected and caused cell damage to the brain. Not only is Kessler a licensed physician, he practiced urology for approximately forty-five years. For approximately thirty years of his career, he was a Professor of Urology at Stanford University Medical Center. He performed numerous procedures involving the prostate, including procedures similar to those Wierschem performed on William. He is familiar with the standard of care as a practicing urologist. Kessler also chaired the Quality Assurance Programs at Stanford University Medical Center; in that role, he reviewed claims to determine whether medical practitioners performing urology services breached the standard of care applicable to a practicing urologist. As Chair, he saw and studied many areas of urology practice, including prostate ablation.

Based on Kessler's extensive career as a urologist who performed procedures similar to those performed in this case and who reviewed claims at Stanford University Medical Center to determine whether urologists breached standards of care in other cases, we cannot conclude the trial court abused its discretion by determining he was qualified to opine about whether Wierschem, a urologist, allegedly failed to properly monitor the fluids placed into and excreted from

–9–

Williams' body and to conduct testing to determine William's sodium levels, and whether those failures caused William to experience low sodium levels leading to cell damage in the brain.

## B.     Standard of Care

Wierschem asserts Kessler does not clearly describe the standards of care Wierschem allegedly violated as distinct from the standards of care Baylor Frisco allegedly violated. To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Abshire*, 563 S.W.3d at 226. While the Act requires only a "fair summary" of the standard of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Id.*

Kessler's amended report sets forth what Wierschem should have done and what he did not do. Kessler's amended report states a urologist performing the relevant surgery should record the amount of fluid given to and excreted by the patient, but Wierschem did not do so. The report further states Wierschem should have been aware of the possibility of abnormal electrolytes, which could cause hyponatremia. In this instance, based on the large amounts of fluid given, the standard of care required Wierschem to order a blood test for William, which was not done; Wierschem's "failure to do a serum electrolyte was a deviation of the standard of care." Finally, according to the report, the standard of care required

–10–

Wierschem to closely monitor the patient, which was not done; rather, William was sent home shortly after the surgery.

Having reviewed the report, we cannot conclude the trial court abused its discretion by determining Kessler's amended report offers more than conclusory statements about the standard of care. Acting within its discretion, the trial court could have determined Kessler identifies specific actions that Wierschem should have taken, but did not. The amended report adequately provides the applicable standard of care for a urologist performing a laser thulium ablation of the prostate and a circumcision on an older patient such as William.

## C. Causation

Finally, Wierschem argues Kessler does not explain the cause of low sodium as it relates to the procedures he performed. Kessler's amended report states that before surgery, William was in good mental health and his sodium reading was 139. While William was at Baylor Frisco, he received at least six liters of lactated ringers, orally consumed water, and had irrigation fluids added to his body. These fluids, taken together, "were too much and were the only cause of the sodium depletion." The sodium depletion caused by excessive fluids left William's sodium level at 119 by the time William arrived at Medical Center of McKinney. Kessler's amended report states: "Readings as low as 119 are very serious and can lead to, and in this case, did lead to brain damage for Mr. Bourgeois." Had Wierschem not breached the standard of care, Wierschem would have monitored the fluid administered to and

excreted by William, ordered a blood test to measure sodium depletion, and monitored William more closely. Doing so, "would have allowed for earlier monitoring and a quicker response . . . to determine whether [William] suffered from hyponatremia."

Kessler's amended report clearly sets forth the standards of care Wierschem allegedly violated and how those breaches caused William's injuries. Within hours of the surgery during which excessive fluids allegedly were administered, William's sodium level fell to 119. Kessler explains that 119 is "very serious and . . . in this case, did lead to brain damage for Mr. Bourgeois." Monitoring the fluids put into and excreted from William's body, as the standard of care required, would have allowed for earlier monitoring and a quicker response . . . to determine whether [William] suffered from hyponatremia."

We conclude the trial court did not abuse its discretion by determining Kessler's amended report represents an objective good faith effort to comply with the statute. Acting within its discretion, the trial court could have determined Kessler's amended report contains sufficient information to inform Wierschem of the specific conduct at issue and the trial court that appellees' claims have merit. That is, the trial court could have determined Kessler's amended report adequately explained the link between Wierschem's alleged failures to properly monitor fluids and administer a blood test, the sodium depletion in William's body caused by the excess fluids, and damage to the brain cells caused by depleted sodium levels.

–12–

Applying the relevant standard of review, we conclude the trial court properly found Kessler's amended report met the requirements of Chapter 74 of the civil practice and remedies code.

<div align="center">CONCLUSION</div>

We affirm the trial court's order denying Wierschem's motion to dismiss pursuant to section 74.351. We remand this cause to the trial court for further proceedings.

<div style="margin-left: 50%;">/Erin A. Nowell/<br>ERIN A. NOWELL<br>JUSTICE</div>

190866F.P05

Evans, J., dissenting



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL WIERSCHEM, M.D.,
Appellant

No. 05-19-00866-CV        V.

WILLIAM BOURGEOIS AND
CAROLYN BOURGEOIS,
Appellees

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-02281-
2018.
Opinion delivered by Justice Nowell.
Justices Partida-Kipness and Evans
participating.

In accordance with this Court's opinion of this date, the trial court's order denying the motion to dismiss filed by appellant Michael Wierschem, M.D. is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 2nd day of April, 2020.